**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**


ERIC McCRARY                                                    PLAINTIFF

VERSUS                                    CIVIL ACTION NO. 2:09cv92KS-MTP

MICHAEL ASTRUE, COMMISSIONER OF
SOCIAL SECURITY                                                 DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a Motion to Dismiss and Motion for Summary

Judgment [Doc. # 18] (July 9, 2010), filed on behalf of Michael Astrue, Commissioner of Social

Security.  The Court, having reviewed the motion, the responses, the pleadings, and exhibits on

file and being otherwise fully advised in the premises, finds that the summary judgment motion

should be **granted**.  The Court specifically finds as follows:


## I. FACTS

Eric D. McCrary raises race and gender discrimination and hostile work environment

claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., and 42 U.S.C.

§ 1981 against his current employer, Michael Astrue, Commissioner of Social Security Agency

(the "Agency").  McCrary, a black male, has worked as an Attorney Advisor/Writer in the Office

of Disability Adjudication and Review ("ODAR") in Hattiesburg, Mississippi, since

approximately August of 2004.  His direct supervisor is Kathryn "Kat" Lukens, a white female.

She oversees timekeeping and leave-related matters.  The Hearing Office Director is Ellen

Davies, a white female, who oversees all other matters including disciplinary matters, performance reviews, supervision of attorney advisors, and case assignments. *See* Pl.'s Mem. Opp. Def.'s Mot. 1-2. The majority of McCrary's complaints arise out of his interactions with Davies.

The problems between McCrary and Davies began following Hurricane Katrina in August of 2005. When the office reopened three weeks after the storm, McCrary asked Davies to assign some cases to him. She instead told him to pull his own cases. She did not tell him how long he had the authority to pull his own cases or when to stop, and he continued to do so for the next six months. All the attorney advisors who testified at the EEOC hearing claim that it was unreasonable for McCrary to think he could pull his own cases for this long period of time, and that him doing so showed a lack of integrity and undermined office morale. *See* EEOC Decision ¶¶ 18-19. When Davies realized that McCrary had been assigning himself his own cases for this extended period, she confronted him.

At this March 7, 2006 meeting, McCrary alleges that Davies "launched into a rage" and "verbally attacked" him for pulling his own cases. She accused him of pulling the easiest type of cases for himself and told McCrary that he had no integrity. *Id.* at 2. McCrary argues that his statistics during this time period shows that he pulled more "Affirmations" than "Reversals" and the Affirmations are generally considered the harder of the two. Bench decisions, the easiest assignments, were assigned by clerical staff on a rotational basis.[1] Davies also challenged McCrary on an annual leave slip. In February 2006, McCrary had requested several consecutive

---

[1]McCrary states that he completed 138 cases during this time: 55 Affirmations, 45 Reversals, and 38 Bench Decisions. Davies testified that out of ten cases, usually only one or two are reversals. EEO Investigative Report, Ex. 9 at 3.

days off for annual leave, and filled out a slip for each day.  Davies noticed that McCrary had improperly marked his last day of requested leave as "sick leave."  While McCrary stated that he unintentionally marked the wrong box on the front of the slip, Davies was suspicious as he had also filled out the back of the slip, which is only required for sick leave and not annual leave.  *Id.* at 2-3; Def's Mem. Supp. Mot. 4.  Following this meeting, Davies placed McCrary on six month probation during which time he would be assigned a larger share of difficult opinions before being returned back to the usual rotation.  No other disciplinary actions were taken against him at this time and Davies claims that during this six month period, McCrary completed his share of difficult cases and did his job well.  Following this incident, McCrary was required to sign his cases in and out with Lukens.  He claims he was the only person required to do this, and that it was May 2007 before an email was sent to all attorney advisors informing them that this check in and check out procedure for cases was official policy for all employees.  *See* McCrary Dep 21-22, Mem. Supp. Mot Summ. J, Ex. A [Doc. # 19-1].   Also McCrary claims that females in the office have always been able to assign their own cases.  In particular, McCrary alleges that JoAnn Davis, a paralegal at the same level as McCrary, assigned her own cases for a period of at least four months.  *See* McCrary Dep. at 21-22.  In support of this claim, McCrary presented copies of several emails that show that Davis had authority to assign cases between August 2007 to December 2007 and that she assigned cases even when other managers were in the office.[2]  *See*

---

[2]The first email, dated August 3, 2007, states that Davies will be out of the office for two weeks and that "JoAnn [Davis] has authority to assign electronic DWPC [sic], and all of you have authority to pull cases out of drawers."  The next email dated November 15, 2007, is from JoAnn Davis to the writers telling them that case assignments have been made.  There is no indication why Davis was assigning cases or how long she had been authorized to do so. The next email, November 27, 2007, is to JoAnn Davis from Debbie Brinkley, a group supervisor, advising her that "Even though Ellen [Davies] is in the office, she is subject to have to leave

McCrary Dep at 24, 29-30, Ex. 7.  Davis has worked in the Hattiesburg ODAR for twenty years, and has worked in her current position for the past eight years.  EEOC Hearing Tr. at 568-570 [Doc. # 19-4].  She claimed in her EEOC hearing testimony that she was sometimes given authority to pull cases for herself and the writers when management was at a conference or otherwise out of the office, but not for longer than a week.  *Id.*

Meanwhile, McCrary applied for other positions in the Agency at offices throughout the country.  Despite making the Best Qualified List for several positions, he was not awarded any of these jobs. In particular, McCrary complains that the Supervisory Attorney Advisor (group supervisor) position in Shreveport, Louisiana, went to an unqualified white female, Debra LeBeau.  *See* Compl. ¶ 7 [Doc. # 1].   Carolyn Anderson, the Hearing Office Director and a black female, was the recommending official for this position in Shreveport and conducted a telephone interview with McCrary in December of 2006.  Following that interview but before making her recommendations to the selecting official, Anderson also called Davies to ask about McCrary.  In her affidavit, Anderson described Davies's review of McCrary as follows:

> My notes indicate Ms. Davies stated the Complainant was a hard-worker, was not the best Writer she had ever seen, but that he tried hard.  Ms. Davies also said he was very well-spoken and had excellent people skills.  Ms. Davies mentioned that the Complainant's integrity was questionable; I cannot remember the gist of the conversation, but I believe it had something to do with the fact that she had to leave the office for a short period of time and had given him permission to assign himself cases.  Ms. Davies said she later discovered that the Complainant had assigned himself 100% reversal cases for a six month period, which to my understanding she found unacceptable.  Ms. Davies never referenced the Complainant's race or gender during our conversation.

suddenly again, so please continue as you have been doing."  The final email, dated December 3, 2007, is from JoAnn Davis informing the writers that assignments had been made.  *See* McCrary Dep. Ex. 7.

Anderson Aff. at 3 [Doc. # 19-1]. Anderson further testified that she thought that she would not have recommended McCrary to the Selecting Official, Regional Chief Judge, Joan Parks-Saunders, even if she had not spoken to Davies because she had concerns about several emails he had sent to her in which she felt he appeared overly anxious.[3] *Id.* She testified that the two candidates that she recommended on December 15, both non-attorney women, one black and one white, were more qualified than McCrary because they had twenty-five or more years of experience with the agency and one had worked previously as a group supervisor and an acting Hearing Office Director. *See* EEOC Hearing Tr. at 180, 199, 210.

Having been unsuccessful in his attempts for a promotion or transfer to another location, McCrary continued to work at the Hattiesburg ODAR. On May 3, 2007, Davies again called McCrary into a meeting attended by Lukens to address McCrary's apparent misuse or manipulation of the office's tracking system, which she saw as another integrity issue. According to the EEO Counseling Report, Davies "berated and scolded" McCrary "like a child" regarding a drop in his productivity rate during the meeting. Davies again challenged McCrary's integrity, stating that he was the lowest "scum" in the office. She accused him of falsifying his individual production lists and counting certain writing assignments multiple times. She told him he would never leave his office, that she was going to move his office so she could keep an eye on his every move, and she was going to stop him from working at home under the

---

[3]Following her deposition, Anderson realized that several of these emails were sent after she made her recommendations. She subsequently contacted Judge Duramis, the other interviewer, about this discrepancy and he reminded her that it was actually several phone calls made by McCrary that made him seem anxious, including one to the receptionist in which "he was not convinced that [Anderson] was not available." These calls prompted her and the other interviewer, Judge Duramis, to contact Davies for her recommendation. *See* EEOC Hearing Tr. at 189-190, 205-207.

Flexiplace Workplace Program. She threatened to lock him out of the office tracking system so he could not report or move cases and told him he would never again be allowed to assign himself his own cases. *See* Pl.'s Mem. Opp. Mot. Summ. J. 3-5. Davies also told McCrary that she had been contacted by various Hearing Office Directors and Chief Law Judges in Maryland, New Orleans, and other ODAR Hearing Office Directors for recommendations on McCrary's behalf, and that she had volunteered her opinion that he had integrity issues based on the six months he assigned his own cases and the leave slip error. During EEO counseling, McCrary alleges Davies intentionally provided misleading information to ruin his chance for promotion.[4] Davies admits to making most of these comments in the May 3rd meeting and admits that she behaved unprofessionally. She denies calling him "scum" and Lukens also testified that she did not hear Davies call him "scum" or make any sexually or racially derogatory comments. *See* Def.'s Mem. Supp. Mot. 8. Likewise, McCrary does not allege any sexually or racially derogatory comments during this meeting.

Later in the day, Davies realized that McCrary's production statistics were incorrect, and that McCrary's production statistics had actually gotten better and not worse. Davies emailed McCrary, copying Lukens and the Administrative Law Judge Allen, admitting her mistake.

---

[4]During the EEOC hearing, Kenneth Cochran, the Hearing Office Director in Jacksonville, Florida, testified that in the fall of 2006, he contacted Davies about McCrary's application for group supervisor there, and Davies stated that McCrary was a "good writer" and "nothing but an asset." EEOC Hearing Tr. 401-02. Cochran testified that McCrary placed second among four attorneys on the Best Qualified List, but that the candidate given the job had eight years experience with the agency, while McCrary only had two years. *Id.* at 402. Administrative Law Judge Michael Hertzig from ODAR in Metairie, Louisiana, testified based on his interview notes that Davies told him that she had ethical problems with McCrary because he had pulled easy cases for six months, but that he was "affable" and "did his work." *Id.* at 26-27, 40. Judge Hertzig testified that he was "on the fence" about McCrary before calling Davies. *Id.* at 39.

Although she still believed that McCrary was manipulating the tracking system to mislead her about the work he was actually accomplishing, she did not take any of the actions threatened at the meeting or any other disciplinary action. Davies also went to McCrary's office to apologize in person. McCrary testified that it was at this later meeting that Davies made her only racial statement to him. EEOC Hearing Tr. 445-46.

> Q. Do you believe she made any racially derogatory statements towards you?
>
> A. The only statement racially was her statement to me . . . after the May 3rd, 2000 [sic] incident in her office when she came to my office to apologize for her behavior and to apologize that the numbers were wrong, her numbers about my production were wrong. And again she came in to my office and because, again, I had all of the documentation to prove I was right anyway, but she just was not giving me an audience at all.
>
> Q. What did she say?
>
> A. She said, you know, Eric, I just want to apologize for what happened, you know, I'll just never know what it's like to be an African American male in your position. And when she said that I sat back in my chair; and I said, you know, Ellen, I have all this stuff but you just didn't want me to show it to you. And I said, I don't know why.
>     Then she gets into, well, you know, we need to– we're going to start over and fresh and, you know, I'll write you positive letters of recommendations. And that's when I pull out the knowledge, because I had no idea that after all of these interviews, and all of this time putting resumes together, preparing for interviews and I'm having them every– couple of them every two weeks it seemed like. I had not [sic] idea that the reason why I didn't get hired on one was because of her.

*Id.* McCrary asserts that he is not sure what exactly she meant by the statement, "I will never know what it's like to be an African American male in your position," but that he believed it be a racial slur and the first time he became aware of "any racial animus in her heart." As a result of Davies's rage and abusive behavior, McCrary claims to suffer extreme mental anguish and emotional distress and has been diagnosed with post-traumatic distress disorder.

McCrary was not the only Hattiesburg ODAR employee to note Davies' temper or to fall victim to negative recommendations. During the EEOC hearing, several employees testified that Davies acted unprofessionally and treated employees with a lack of respect with the use of loud and abusive behavior, regardless of race and/or sex. *See* EEOC Decision ¶ 37. Martha Kirby, a white female attorney, testified that Davies had once come into her office and slammed her Flexiplace time sheet on her desk and "went off" on her about how unprofessional it was for her not to have answered her cell phone the day before when Davies tried to call her. EEOC Hearing Tr. 602. Kirby testified that the incident brought her to tears and that Davies's response was "way out of proportion." *Id.* While Kirby testified that Davies had a reputation in the office for blowing up with people in the office and letting her "emotions dictate," she did not believe these incidents were associated with race or gender bias. *Id.* at 603. Laurie Porciello, a white female attorney, testified that Davies has lost her temper with her and with other females in the office in general, and particularly with the group supervisors, all of whom are white females. *Id.* at 546. Administrative Law Judge Robert Allen testified that he had orally counseled Davies on her loss of temper. *Id.* at 258. Kathy Lukens testified that in the fall of 2007 she saw Davies yell at an employee, Beverly Flyer, a white female, for not being truthful about her production and taking cases out of the office without permission with the same intensity as she yelled at McCrary. *Id.* at 89-90.

Two white female employees testified that they either suspected or knew that Davies had given them and others negative recommendations. Laurie Porciello, a white attorney with the agency testified that she was given what she considered a negative recommendation for an ALJ position when Davies advised that Porciello was a "procrastinator" and "did not push out big

numbers of cases."  EEOC Hearing Tr. at 544-45.  Martha Kirby, a white senior attorney, also speculated that Davies made negative comments about her when agency employees called her for a recommendation because Davies shared with her some of the bad things she said about other employees. *Id.* at 605-06.

McCrary sought EEO counseling on May 11, 2007, and his formal complaint along with the EEO Counseling Report with the Office of Civil Rights and Equal Opportunity (OCREO) alleging race discrimination (black), sex discrimination (male), and hostile work environment was officially filed on June 15, 2007.  *See* Def.'s Mem. Supp. Mot. Summ. J., Ex. A, Sub-Ex. 2 at Exs. 1 & 5 [Doc. # 19-1].  McCrary was advised that his case was accepted for investigation by the Agency in a September 6, 2007, letter which explained how he could amend his complaint or add like or related claims of discrimination.   The letter described the nature of the action as follows:

> You claim that based on your race (Black) and sex (male) on May 3, 2007, when managers from four (4) different offices called for recommendations for the Supervisory Attorney-Advisor position for which you had applied, the Office Director intentionally gave out negative information to the Chief Judges and Hearing Office Directors in New Orleans and Maryland.  She later apologized to you for her mistake but never rescinded her statement to the managers.

*Id.* [Doc. # 19-1 at 143].  Following the completion of the EEO investigation on November 15, 2007, a satisfactory resolution was not reached, and McCrary sought an EEOC hearing.  *See id.,* Ex. A, Sub-Ex 2.

In January 2008, EEOC Administrative Law Judge Martin, denied McCrary's motion to clarify his claim to include discrimination through non-selection, and determined that the case would proceed under the original allegations of disparate treatment and hostile work environment based on race and sex.  *See id.*,  Ex. A, Sub-Ex. 4 [Doc. # 19-4].  On August 28 and

29, 2008, the EEOC hearing was conducted and Judge Martin determined that McCrary had not established a *prima facie* case and the Agency had given legitimate non-discriminatory reasons for its actions. Judge Martin also determined that the harassment suffered by McCrary was not directly related to his protected class or that the harassment was severe or pervasive enough to alter the terms and conditions of his employment. *See* Final Order, Def.'s Mem. Supp. Mot. Summ. J., Ex. A, Sub-Ex. 6 [Doc. # 19-4].

McCrary then filed the present suit alleging three causes of action. First, McCrary alleges race discrimination for failure to promote because he was not awarded the position of Supervisory Attorney Advisor ("group supervisor") in the Shreveport office and the position was instead given to an unqualified Caucasian employee, Ms. Lebeau. Second, McCrary alleges a hostile work environment based on race. Third, McCrary alleges sex discrimination because female employees were allowed to assign their own cases while male employees were not.

The Agency now moves for dismissal of McCrary's discrimination claims based on non-selection since he failed to exhaust his administrative remedies, and therefore, this Court lacks subject matter jurisdiction. The Agency also seeks dismissal of the rest of the claims for race and sex discrimination and hostile work environment claiming that there is no genuine issue of material fact and the Agency is entitled to judgment as a matter of law.

## II. STANDARD OF REVIEW

A Rule 12(b)(1) motion attacks the court's jurisdiction to hear and to decide any issues in the case and therefore the court must address the motion at any time during the pendency of the litigation or even indeed upon its own motion. *See Williamson v. Tucker*, 645 F. 2d 404, 412-13

(5th Cir. 1981). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). It is well settled that on a 12(b)(1) motion the court may go outside the pleadings and consider additional facts, whether contested or not and may even resolve issues of contested facts. *Williamson,* 645 F.2d at 413. If the court considers external matters to the pleadings the allegations of the complaint need not be taken as true. *Id.* If the factual matters considered outside the pleadings are undisputed, the court need not make specific factual findings for the record. Conversely, if the court is called upon to make factual determinations to support its order, they should, "identify and explain the factual determinations it has made." *Id.* at 413-14. The party asserting jurisdiction has the burden to prove it. *Boudreau v. United States*, 53 F.3d 81, 82 (5th Cir. 1995).

Summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2)*; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). To support a motion for summary judgment, "the moving party ... [has] the burden of showing the absence of a genuine issue as to any material fact." *Burleson v. Tex. Dept. of Criminal Justice,* 393 F.3d 577, 589 (5th Cir. 2004). Material facts are those that "could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (internal citations omitted). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" on that issue. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the court views all evidence "in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in its favor." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 331 (5th Cir. 2007). If the movant satisfies its initial burden, then the burden shifts back to the nonmoving party to produce evidence indicating that a genuine issue of material fact exists for each essential element of its case. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 246-47 (5th Cir. 2003). The nonmovant is not entitled to merely rest on his pleadings, but must set forth "specific facts showing there is a genuine issue for trial." *DirecTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). If the nonmovant responds and still "no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni v. General Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

## III. APPLICATION

### A. Claim One: Race Discrimination for Failure to Promote

McCrary's claim for race discrimination for failure to promote must fail because it was not brought within the time limits set forth in Title VII. "Before an aggrieved [federal] employee may seek relief through the filing of a civil action in federal court, [Title VII] requires that he or she must first seek relief in the agency that has allegedly engaged in discrimination." *Brown v. General Services Administration*, 425 U.S. 820, 832 (1976); *see also Barnes v. Levitt*, 118 F.3d 404, 408 (5th Cir. 1997). Federal employees are required to contact an EEO counselor within forty-five days of any alleged discriminatory event. *See* 29 C.F.R. § 1614.105(a)(1); *Ramsey v.*

*Henderson*, 286 F.3d 264, 269 (5th Cir. 2002). As the Supreme Court has noted, "[s]trict adherence to Title VII's timely filing requirements is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver*, 477 U.S. 807, 826 (1980). Accordingly, the Supreme Court has ruled that any complaint of discrimination involving discrete employment actions must be brought within the time limits set forth in EEOC regulations or face dismissal. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-11 (2002). The EEO counselor is also required to notify the complainant that "only the claims raised in pre-complaint counseling (or issues or claims like or related to issues or claims raised in pre-complaint counseling) may be alleged in a subsequent complaint filed with the agency." 29 C.F.R. § 1614.105(b)(1).

Examples of discrete employment actions include "failure to promote" and "refusal to hire." *Morgan,* 536 U.S. at 114. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." *Id.* "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." *Id.* "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Id.* at 110.

Here, the claim for race discrimination for failure to promote would be untimely because it would have occurred more than 45 days before McCrary first contacted the EEOC with this particular complaint. The alleged racially discriminatory event complained of is the non-selection of McCrary for the Shreveport group supervisor position in December of 2006. Although McCrary first contacted an EEO Counselor in May 2007, he did not present his non-selection claim to the EEOC until January 2008 when he submitted a motion to clarify his claim,

a motion that was subsequently denied.[5]  In this motion, McCrary sought to clarify his charge to include a claim that Davies's discriminatory animus was imputed to the titular decision-makers under the "cat's paw" theory.  *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) ("If the employee can demonstrate that others had influence or leverage over the official decision-maker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decision-maker").  Until his attempt to clarify his claims, McCrary's claims arose out of Davies's alleged disparate treatment of him based on his race and sex.  McCrary's allegations to the EEO counselor were that Davies did not treat white employees in an equally demeaning way, and that female employees were not subjected to the same restrictions in assigning cases to oneself.  At no point in his original EEOC charge did McCrary allege that the Hearing Office Directors in the various cities, based their recommendations to the final decision-makers on race or gender or had any discriminatory animus.   Because McCrary did not contact an EEO counselor within forty-five days of any of his non-selections for the position to which he applied, he failed to exhaust his administrative remedies and the Court lacks subject matter jurisdiction over McCrary's first cause of action: the failure to promote him to the Shreveport group supervisor position because of race.

---

[5]McCrary argues that he properly raised this claim to the EEO Counselor in May 2007 and his motion in January of 2008 was merely fleshing out the existing charges.  Even so, the Court cannot consider the discrete discriminatory event, McCrary's non-promotion, to have occurred on May 3, 2007, which is when McCrary discovered that Davies had given negative recommendations for the various supervisory positions he had applied for and determined that this likely explained his non-selection.  Clearly established law requires the court to look at the day that the non-promotion happened and not the day that the claimant discovered that possible discriminatory intent influenced his non-promotion.  *See Morgan*, 536 U.S. 101, 114 (2002).

## B.  Claim Two: Hostile Work Environment Race Discrimination

McCrary has failed to prove a genuine issue of material fact to demonstrate a hostile work environment based on racially discriminatory conduct.  The plaintiff in a hostile work environment claim must establish that: (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action.  *EEOC v. WC&M Enters. Inc.,* 496 F.3d 393, 399 (5th Cir. 2007).  Title VII provides a legal remedy to victims who establish that the abusive conduct was sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment.  *Id.* (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

In determining whether an environment is "hostile" or "abusive" within the meaning of Title VII, courts look at the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993).  Actionable harassment must be "both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Shepherd v. Comptroller of Pub. Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir. 1999).  A single egregious incident can sufficiently alter the terms and conditions of employment to create a hostile work environment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775,  788 (1998).  However, mere utterance of a racial epithet which engenders offensive feelings, will not be

considered severe and pervasive to implicate Title VII. *See Harris*, 510 U.S. at 21; *see also*

*Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2007) (quoting *Faragher*,

524 U.S. at 788) ("simple teasing, offhand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory changes in the 'terms and conditions of

employment.'").

Here, the Court agrees that while McCrary is a member of a protected class (black) and

was subjected to unwelcome conduct, he failed to show that the harassment was based on race or

affected a term, condition, or privilege of his employment. McCrary alleges that the racially

discriminatory conduct that created the hostile work environment was Davies's "untrue

derogatory and negative statements against him to the deciding official that caused him to be

passed over for said position" and Davies's "belligerent and unprofessional" behavior towards

him, namely, "calling him names and threatening to create an unpleasant working environment

for him." See Compl. ¶ 15.

Looking first to the derogatory statements made to the recommending officials, McCrary

fails to show that Davies's negative reviews of McCrary's performance at the Hattiesburg

ODAR were based on race or affected his condition of employment. All of the officials that

contacted Davies for a review stated that she did not mention race or gender, and they all noted

that they would have made the same decision regardless of Davies's opinion of McCrary. In

particular, Anderson, the Hearing Office Director in Shreveport, stated that she would have

recommended the same two women for the position because of their impressive work experience

whether or not Davies had given her recommendations. The one comment Davies made to

McCrary about his race– that Davies did not know what it was like to be an African American

male– was too far removed in time from the period when she was giving her recommendations to attribute any animus from the statement to her assessment of McCrary months earlier. Furthermore, McCrary has not cited an instance in which Davies gave anyone in their office a wholly positive recommendation. To the contrary, two white female attorney advisors in the Hattiesburg ODAR testified that they had received less than positive recommendations from Davies and that Davies had shared other negative opinions she had about Hattiesburg ODAR employees. Therefore, having failed to meet the third and fourth prongs of the hostile work environment test, McCrary has failed to meet his burden.

Turning then, generally, to Davies's belligerent and unprofessional behavior, McCrary fails to show that her behavior in the office was based on race. Having reviewed the voluminous record, there is no doubt that Davies maintained an unpleasant work environment. Despite all the conflicts and accusations of favoritism, one thing was consistently reported throughout– Ms. Davies's temper problem and unprofessional behavior was offensive and pervasive. The testimonies of Judge Allen, Kat Lukens, Ms. Porciello and Ms. Kirby clearly demonstrate that Davies frequently lost her temper and was known to raise her voice at other employees both black and white, male and female. McCrary does not present any evidence that Davies's unprofessional behavior towards him was different in kind or frequency. Davies "blew up" on McCrary only two times in a little under three years of employment. While the working relationship between Davies and McCrary was far from ideal, the record indicates that despite her unprofessional behavior in their two meetings, Davies thought that McCrary was generally performing as required, and, in fact, his production statistics had improved in 2007. Although Davies threatened to restrict his rights in several ways, Davies did not make good on these

threats. The one restriction placed on McCrary, that he could no longer assign his own cases, was a job task for the group supervisors in the first place, and not attorney advisors except under special conditions such as management being out of the office at a conference. The other restriction, that he had to sign case work in and out has not been shown to be linked to McCrary's race rather than as a consequence for some of his performance issues and previous mistakes or oversights which Davies interpreted as a lack of integrity. Although Wanda Garner, a black female senior case technician, testified that Davies treats Caucasians better than African-Americans, she did not offer any instances of race discrimination or preferential treatment in the office, but only her conclusory opinion. *See* EEOC Hearing Tr. at 318. Indeed, McCrary himself testified that he had no idea of the "racial animus in her heart" until after the May 2007 meeting when she made the perceived racial slur.

The only offensive conduct based on race was the comment that Davies did not know what it was like to be an African-American male in McCrary's position, which McCrary perceived as a racial slur. Although Davies's comment was insulting, standing alone, this singular racial slur does not demonstrate severe or pervasive offensive conduct based on race. In sum, though the Court does not condone Davies' management style or temper, the Court finds that McCrary has failed to shown that her actions arise to the level of a hostile work environment based on race. Therefore, McCrary's claims for disparate treatment race discrimination must fail.

### C. Claim Three: Sex Discrimination

McCrary has failed to put forth *prima facie* evidence that Davies's decision to no longer allow McCrary to assign his own cases was a decision impermissibly based on his gender.

Plaintiff alleges sex discrimination in violation of Title VII of the Civil Rights Act of 1964.[6] Title VII forbids an employer from subjecting an employee to an adverse employment action because of their sex. *See* 42 U.S.C. § 2000e-2(a)(1) (2000). Without direct evidence of discrimination, a plaintiff can use the *McDonnell Douglas-Burdine* framework to establish his *prima facie* case and raise a presumption of discrimination. *See Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179-80 (5th Cir. 1999). To state a *prima facie* case for sex discrimination, the plaintiff must show that he: (1) is a member of a protected class; (2) was qualified and applied for his position; (3) was subject to an adverse employment action; and (4) that others similarly situated were treated more favorably than him. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253-54 (1981); *Okoye v. University of Texas Houston Health Ctr.*, 245 F.3d 507, 513-14 (5th Cir. 2001) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)).

"Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." *See Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (quoting *Pierce v. Texas Dep't of Criminal Justice, Institutional Div.*, 37 F.3d 1146, 1149 (5th Cir. 1994)).

"The Fifth Circuit has held that the 'nearly identical' standard applies [] to the fourth prong of the *prima facie* case." *Coleman v. Exxon Chem. Corp.*, 162 F. Supp.2d 593, 608 (S.D.Tex. 2001) (citing *Williams v. Trader Publishing Co.*, 218 F.3d 481, 484 (5th Cir. 2000); *Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1062 (5th Cir. 1998); *Mayberry v. Vought*

---

[6]The analysis is the same under both §1981 and Title VII. *See Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).

*Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995)). "Employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'" *Id.* (citing *Okoye*, 245 F.3d at 514-15).

If the plaintiff successfully sets forth the *prima facie* case of discrimination, then the defendant must articulate some legitimate, non-discriminatory explanation for their actions. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). If the defendant can produce this non-discriminatory reason, the presumption disappears. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).

The plaintiff "bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against [him] because of [his] protected status." *Wallace v. Methodist Hosp. System,* 271 F.3d 212, 219 (5th Cir. 2001). The plaintiff at this point "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The plaintiff may "attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (citing *Burdine*, 450 U.S. at 256). The plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Wallace,* 271 F.3d at 219. Alternatively, under the modified *McDonnell Douglas* approach, the Plaintiff may argue that the Defendant's reason, while true, was only part of the reason for the decision, and that discriminatory animus

was a motivating factor. *Keelen v. Majesco Software, Inc.*, 407 F.3d 332, 340-41 (5th Cir. 2005). If the plaintiff demonstrates this, then the defendant must prove that the same adverse employment decision would have been made regardless of the discriminatory animus. *Id.* at 340. "The question of pretext versus mixed motive treatment is only reached after a plaintiff has met his *prima facie* showing under the modified *McDonnell Douglas* standard and the defendant has responded with a legitimate nondiscriminatory reason." *Id.* at 341 (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

In this case, McCrary belongs to a protected group (male) and is qualified for his position as Attorney Advisor. As for the adverse employment action, McCrary alleges that female employees were allowed to assign their own cases while male employees were not. While a reprimand may be considered an adverse employment action, the differential treatment alleged here, even if true, does not involve an ultimate employment decision affecting McCrary's job duties, compensation, or benefits. Assigning cases to oneself was never a part of McCrary's job description, but was a temporary accommodation during a period of time following Hurricane Katrina. In the Hattiesburg ODAR, case assignments were made by Davies or the group supervisors except under limited circumstances when they were unable to make assignments, such as an absence from the office. In this situation, employees could assign cases to themselves only with permission and only for a limited time, such as the limited time period in which JoAnn Davis assigned cases to herself and the other writers in the office. Several employees testified that McCrary making assignments to himself for six months was an unusual function for an attorney advisor and would show a lack of integrity.

Even if Davies's actions were considered an adverse employment action by virtue of it

being a reprimand that affected his job duties, he has not shown that similarly situated employees were treated differently. McCrary has not shown that he and Davis were similarly situated. Although Davis was a paralegal and not an attorney, she had many more years of experience at the ODAR than McCrary and there is no indication in the record that Davies had concerns involving Davis's integrity.

In support of his sex discrimination claim, McCrary notes the testimony of John Hutto, a white male senior attorney who claims that Davies made gender derogatory comments, assigned the more difficult cases to the men in the office, and was more prone to raise her voice towards men and use abusive language than with women. While evidence to support these allegations may be helpful to McCrary at the pretext stage to show that the reason for Davies's actions was discriminatory animus and not her perceived abuse of the system by McCrary or for a hostile work environment claim due to sex discrimination, it does not help prove his *prima facie* case for this claim. McCrary failed to show another similarly situated employee that was allowed to assign her own cases for an extended period of time without special permission from Davies. Therefore, having failed to meet his *prima facie* burden, McCrary's claims for gender discrimination must fail.

## IV. CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Summary Judgment [Doc. #42] filed on behalf of Defendant, is hereby **granted** and Plaintiff's complaint is **dismissed with prejudice**. Any other pending motion is denied as moot. A separate judgment

shall be entered herein in accordance with Fed.R. Civ. P 58.

SO ORDERED AND ADJUDGED this the 17th day of September, 2010.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE